BECTON, DICKINSON AND COMPA-
NY, Plaintiff-Appellant-Cross
Appellee,

v.

SHERWOOD MEDICAL INDUSTRIES
INC., Defendant-Appellee-Cross
Appellant.

No. 72–3599.

United States Court of Appeals,
Fifth Circuit.

July 28, 1975.

John F. Corrigan, Jacksonville, Fla., Kane, Dalsimer, Kane, Sullivan, Kurucz & Goldstein, New York City, Leon Jaworski, Jefferson D. Giller, Houston, Tex., for plaintiff-appellant.

George L. Hudspeth, Jacksonville, Fla., Stanley N. Garber, St. Louis, Mo., William J. Stellman, Chicago, Ill., for defendant-appellee.

Before BROWN, Chief Judge, and COLEMAN and DYER, Circuit Judges.

JOHN R. BROWN, Chief Judge:

In the midst of today's turbulent world, we have before us two prominent medical supply firms—Becton, Dickinson and Company (B-D) and Sherwood Medical Industries, Inc. (Sherwood)—controverting who has the right to manufacture and sell the most efficient system of blood letting. Shortly after World War II, B-D patented a device, the Vacutainer, which partially solved the problem of taking multiple blood[1] samples without risking blood coagulation, or having to puncture the body walls more than once.[2] Recently, both B-D and Sherwood marketed devices advertised as solving the last piece of the problem. On appeal, B-D hopes to preserve the patent-monopoly recently lost by the combination of its Vacutainer patent's expiration and the rulings below that (i) its latest devices are not validly patented, and (ii) even if they are, Sherwood's device does not infringe those patents. After carefully reviewing the record, we find ourselves in agreement with the District Court's result, except insofar as it found B-D chargeable with conduct amounting to fraud on the Patent Office.[3] The upshot is that Russo-Halligan, No. 3,494,352, and Nehring, No. 3,469,572, are held to be invalid.

The essential feature of B-D's Vacutainer system is the receptacle which holds the collecting tube. Each collecting tube[4] is partially evacuated, and sealed with a rubber-like stopper. A double needle-ended cannula[5] is affixed in, and passes through the end of the holder which is slightly bigger than the

1. The primary utility for the devices in suit is blood sampling. However, in the interests of completeness, it appears—as claimed—they may also be used in sampling other body fluids.

2. Taking one large sample, then separating it into smaller samples, is unsatisfactory because of the (i) quickness of harmful coagulation, and (ii) ease of causing hemolysis of the blood. "Hemolysis" is destruction of blood cells, and can be caused by applying physical force such as that in sudden contact with hard surfaces.

3. Falling with this is the allowance of attorneys' fees and Sherwood's antitrust cross-

claim which the District Court denied on dubious grounds of lack of proof of relevant market and damages.

4. Different anti-coagulants are pre-introduced into the several containers used with each sampling. Different anti-coagulants are required for different tests conducted on the blood. E. g., a test for sodium is of no value if the anti-coagulant contains sodium.

5. A cannula is a small needle-like tube, in this case metallic, which may be inserted into a patient's blood vessels for collection purposes.

collecting tube. Thus, the holder serves as a guide, so one end of the needle can penetrate the patient's blood vein, while the other penetrates the rubber stopper of the tube. The combination of the patient's blood pressure and the tube's partial vacuum causes blood to be drawn into the sampler tube. The collecting tube's stopper is self-sealing so that, when the tube is withdrawn from the holder, no blood is lost from it.

A second sample can be obtained by inserting a second collecting tube in the holder until its stopper is fully penetrated by the "rear" end of the cannula. A second body-penetration is avoided.

Of course, the flaw in the operation was long known—the patient's blood pressure causes the blood to spill from the cannula while no collecting container is attached. While no serious physical consequences are likely to result from the loss of blood, the significantly detrimental psychological effects are obvious. A number of means for preventing spillage were tried. These need not be related in detail, except to say they proved unsatisfactory either because (i) too costly, (ii) too unreliable, (iii) too awkward for use by relatively unskilled technicians, or (iv) too complex for one person to operate.

All three devices involved in this suit avoid those objections. All three incorporate valve means which are "automatic" in the sense the blood flow is stemmed by the operator's removing the collecting tube from the rear needle—further manipulation is not required. Further, the construction of each is inexpensive enough to permit their being discarded after one use. B-D holds patents on two of these, Russo-Halligan[6] and Nehring[7] devices. Sherwood manufac-

tures and sells the third, the "M–214", which is not patented.

Thus, the state is set for the classical patent-battle: B-D sues Sherwood for infringing its patents, Sherwood (i) denies, asserting that both patents are invalid (for a multitude of different reasons) or not infringed, and (ii) counterclaims for attorneys' fees[8] and antitrust[9] treble damages.[10]

### Too Many Cooks

#### Russo-Halligan Falls

■ Patent-monopoly protection is designed to reward the creativeness deemed by the Founding Fathers to be of value to the Republic, U.S.Const. art. I, § 8, cl. 8. As a corollary, the rule is patent protection may not issue in favor of persons not responsible for the creation of advances otherwise qualifying for the specified protection. Iowa State University Research Foundation v. Sperry Rand Corp., 1971, 4 Cir., 444 F.2d 406; 35 U.S.C.A. §§ 102(f), 256. B-D conceded on oral argument that the Russo-Halligan patent cannot be sustained if the District Court was correct in sustaining Sherwood's contention that half the team (namely Russo) did not participate in conceiving the invention.

■ Before we resolve that question, we turn to B-D's argument it is entitled, because of the issued patent, to a presumption of joint inventorship which may only be overcome by a quantum of evidence greater (though we are not told how much greater) than a mere preponderance of the evidence. We think it is clear B-D is entitled to a presumption of joint inventorship, as a part of the general presumption of the patent's validity as a whole. Simply introducing the pat-

---

**6.** Patent No. 3,494,352, issued to Ronald D. Russo and James C. Halligan on February 10, 1970, applied for by Russo alone, August 18, 1966, conversion to joint inventorship approved in notice of January 23, 1969, and "streamline" continuation March 26, 1969.

**7.** Patent No. 3,469,572, issued to John Richard Nehring on September 30, 1969, applied for

August 18, 1966, the same day Russo originally filed his sole application.

**8.** 35 U.S.C.A. § 285.

**9.** Sherman Antitrust Act § 2, 15 U.S.C.A. § 2; Walker Process Equipment, Inc. v. Food Machinery and Chemical Corp., 1965, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247.

**10.** Clayton Act § 4, 15 U.S.C.A. § 15.

ent establishes a prima facie case in favor of B-D.

We decline to pass on the accuracy of B-D's contention beyond that, however, because we think the evidence before the Trial Court was such that it was entitled to reach its conclusion upon any standard B-D could be taken as asserting.[11] Briefly, the Court had three evidentiary touchstones for its conclusion. First, depositions of both Russo and Halligan in which each explained the project's development. Second, a free-hand drawing [12] Halligan made in 1964 about a year before Russo was employed by B-D, and explained in Halligan's deposition. Third, the technological background and experience of each as reflected in these depositions.

■ It is apparent from examining Halligan's drawing and the portion of his deposition explaining it, that the essential mechanical means had been conceived when the drawing was made. His deposition shows that his experience with blood sampling devices was substantial—that he was familiar with the problem that had to be overcome, acquainted with earlier efforts to overcome it, and most important, regularly concerned with doing so. On the other hand, Russo's involvement was limited to depicting Halligan's idea. His background includes a Bachelor of Arts Degree in Industrial Design from the Rhode Island School of Design and pre-B-D experience limited primarily to toy design. Though both men were asked to identify specific contributions made by either one to the sampler's development—beyond those shown by the drawing to be already extant—neither was able to do so. In short, viewing all these things together, we are left with the firm and definite impression that the Trial Court had ample basis, for concluding as a fact that Halligan invented the device both he and Russo patented.[13]

### Adam[s] Started It All

#### Nehring Falls

The Sherwood M–214 needle is nearly identical to the Nehring device.[14] Therefore, it is necessary to analyze Sherwood's contention that because of the prior art reflected by earlier patents—that one skilled in constructing blood sampling devices could, with the exercise of merely mechanical skills, have constructed the Nehring device.

In particular, Sherwood cites Adams, No. 2,847,995.[15] Responding, B-D argues (i) Adams (a B-D employee) never intended the sleeve device to do anything but protect the sterility of a needle to be used in transfusion, (ii) Adams depended on internal corrugations for resiliency—corrugations containing air and, therefore, presenting the danger of air embolism in the context of blood sampling (as opposed to transfusion) and (iii) it could not be obvious to use the Adams device in the Vacutainer system, because no one ever did.

---

11. We synthesized the burden of proof in Hobbs v. United States, 5 Cir., 1971, 451 F.2d 849, Part V at 855–57.

12. Defendant's Ex. 100.

13. The "who did what" issue is also involved in Sherwood's antitrust counterclaim, insofar as it was alleged the Russo-Halligan patent was obtained on four false oaths to the Patent Office. See, Four Oaths—Fair or Foul?, p. 521, infra.

14. In fact, Sherwood's non-infringement argument is limited to the fact that in Nehring the blood discharges through a side opening in the cannula, while in the M–214 the cannula is open-ended.

Thus, Nehring involves a change in direction of blood flow, but the M–214 does not. Sherwood argues that is critical because Nehring claims a device with a passage "network"—and absent a change in direction, the blood does not flow through a "network".

Our research has disclosed only one judicial attempt to define "network", "[a] network is a national chain of radio or television stations." Glenn v. Advertising Publications, Inc., 1966, S.D.N.Y., 251 F.Supp. 889, 892 n. 2. Because of our disposition of this case, we need not pass either upon the correctness of that Court's definition or its application to the facts of this case.

15. Patent No. 2,847,995 issued August 19, 1958 to John Q. Adams. See Patent No. 2,689,562 issued September 21, 1954 to Adams and Joseph J. Kleiner, of which Adams '995 is a continuation in part.

[4] The resolution of these arguments requires examination of what is "obvious". It is probably safe to say the difference between obvious and non-obvious advances is whether "creative", as opposed to "mechanical", skills were required to make them. But we have found—from reading cases cited in the briefs and from our independent research—this proposition is often really just a statement of the problem, not a reason why.

We suspect the immense difficulty stems from a combination of two sources, (i) the two concepts are not really mutually exclusive—a skilled mechanic can be creative and a creation can be mechanical—and (ii) those ultimately called upon to make the decision, Judges such as ourselves, are almost never "skilled in the art" and must rely on expert testimony—which, as in this case, is often conflicting as to what is "obvious" and what is not.

■ The District Court concluded[16] Nehring would be obvious, in the light of Adams to anyone skilled in the art. Aft-

16.
*Findings of Fact*

\* \* \* \* \* \*

23. Sleeve valves for use in combination with blood sampling devices are not original with Nehring. Plaintiff's own Adams patent, No. 2,847,995 issued on August 19, 1958, shows a blood sampling device having a needle to be inserted into a vein and a second needle to be inserted through the stopper of an evacuated container, the needles being interconnected by flexible tubing. A flexible sheath or sleeve covers the end of the needle to be inserted through the stopper of a container. When the needle is so inserted, the needle point pierces the sheath, and stopper, and thus is coupled with the interior of the container. This is the type of sleeve used by the defendant in its M–214 needle. When the needle is withdrawn, Adams' sheath or sleeve may be pulled downwardly over the needle and the hole pierced by the needle is sealed because the material is self-sealing. While the patent illustrates a sheath or sleeve which may not possess sufficient resiliency to return to extended position by itself, the patentee points out that "any preferred expedient may be employed to assist the sheath in assuming an extended condition". In sum, the Adams patent shows a sleeve valve to be used in conjunction with multiple blood sampling devices for shutting off flow of blood while changing containers. It would be obvious, in view of the quoted statement in the Adams patent, to use a spring to assure return of the sleeve to its extended position. Furthermore, it is merely a manufacturing expedient to choose to rely on a spring incorporated in the sleeve, such as a coil spring, to return the sleeve to its extended position, or to rely on the resiliency of the material itself. That Adams knew that a spring could be associated with the sleeve or sheath to return to its extended position is obvious from the patent application he originally filed; for the specification contained the following statement:

"To this end a coil spring may be interposed between the needle and the sheath as shown in figures 5, 6 and 7. This spring would be of relatively weak power and would bear, at one end, against the hub assembly of the needle. At its opposite end it would bear against the sheath adjacent the bore portion 44 of the latter. The spring, so positioned, would permit of the parts being manipulated in precisely the manners heretofore described. However, the sheath would not remain in retracted position, as shown in fig. 7. Rather, the spring would furnish sufficient tension to return the sheath over the needle shank so that the point of that needle would again be enclosed in the sheath as shown in fig. 5. Such enclosing would occur automatically as the needle was withdrawn from the container or tissue."

Utilizing such a sleeve in combination with the old Vacutainer system, or in place of the valve shown in the Russo-Halligan patent, or in place of the manual shut-off valve offered for sale by plaintiff prior to 1964, would produce the device sought to be covered by the claims of the Nehring patent. Such combination would be obvious and would produce neither a new nor unexpected result.

24. When John Q. Adams, the patentee of the Adams patents 2,689,562 and 2,847,995, first made a sleeve of the type shown in Figs. 6–8 of the '995 patent, the sleeve did extend automatically when the needle was withdrawn from the stopper without the necessity of a coil spring or other means to bring the sleeve or sheath to extended position. This is hardly surprising because both Adams '995 and the Nehring patent in suit use identical materials for the sleeve—natural or synthetic rubber. Furthermore, the defendant produced in court a sleeve made in accordance with plaintiff's manufacturing drawings of a form of the Adams sleeve. Defendant mounted the Adams sleeve so manufactured in the same position that the sleeve valve occupies in the defendant's accused M–214 needle. It was demonstrated in open court that the Adams sleeve thus mounted collapses as an evacuated tube is pushed up into the holder and extends automatically when the tube is withdrawn. When extended, the sleeve acted as a valve to shut off further flow of fluid. Defendant's accused M–214 needle is little more than its old M–210

er comparing the two devices [17] and examining the relevant testimony, we are satisfied there is no error in the District Court's conclusion, whether assayed as a

needle equipped with a sheath or sleeve such as shown in Adams '995 patent.

\* \* \* \* \* \*

*Conclusions of Law*

\* \* \* \* \* \*

5. The Nehring patent is invalid under 35 U.S.C. § 103 because the differences between

the subject matter thereof and the prior art are such that the subject matter would have been obvious to a person having ordinary skill in the art at the time the purported invention was made.

17.

Sept. 30, 1969     J. R. NEHRING     3,469,572

APPARATUS FOR TAKING MULTIPLE FLUID SAMPLES

Filed Aug. 18, 1966     2 Sheets—Sheet

FIG. 10   FIG. 11   FIG. 12   FIG. 13

INVENTOR.
JOHN R NEHRING
BY
ATTORNEYS

matter of law, Samuelson v. Bethlehem Steel Co., 5 Cir., 1963, 323 F.2d 944, *cert. denied*, 1964, 376 U.S. 938, 84 S.Ct. 793, 11 L.Ed.2d 659, of fact, or law and fact, Gaddis v. Calgon Corp., 5 Cir., 1975, 506 F.2d 880.

Given the Adams "sheath" we are satisfied the Nehring and M–214 concept was before the relevant world. A less cumbersome sheath than that shown in Adams was certainly desirable, but the advance which resulted in one's being available is largely creditable to the Shell Chemical Company which developed a material both naturally resilient and self-sealing. With that material available Sherwood began to manufacture the M–214. Before too long B-D

Aug. 19, 1958     J. Q. ADAMS     2,847,995

TRANSFUSION NEEDLE SHEATH

Filed Aug. 23, 1954     2 Sheets–Sheet 2

INVENTOR
John Q. Adams

also abandoned the Nehring side port design in favor of one similar to the M–214.

▆ In short, we agree with the District Court that once Adams disclosed the sheath and the proposition it had potential utility as a retractable sealant,[18] the creative process was essentially complete. Later material advances permitted improvement, but material substitution is a non-patentable, mechanical operation. To B–D's contentions that (i) there is "creation" just in substituting the Adams *transfusion* sheath into a *sampling* device, and (ii) the delay between the Adams and Nehring patents refute Sherwood's argument the first made the second "obvious", the record shows that employees of both companies *did* conceive remarkably similar devices [19] before Nehring developed his. In Any event, we do not find B–D's arguments sufficiently persuasive.

Nehring being invalid we need not assay the District Court's holding of non-infringement by M–214.

### Unfair Dealing with the Patent Office

Although during oral argument, Sherwood expressly disclaimed any assertion B–D engaged in intentional fraud before the Patent Office, it argues strenuously that B–D engaged in "other inequitable conduct" having the effect of voiding *ab initio* any protection here asserted under either Russo-Halligan or Nehring. Because of our holdings on the patent validity issues, it is only necessary to consider this point insofar as it bears on the contention that B–D commits an antitrust violation by bringing this (or any) suit on those patents.

▆ Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co., 1945, 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381, which states the policy behind Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 1965, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247, appears to admit of this possibility,[20] but it is the rule in this Circuit that an antitrust action may be made out only upon showing the patentee intentionally defrauded the Patent Office. Beckman Instruments, Inc. v. Chemtronics, Inc., 5 Cir., 1970, 428 F.2d 555, *cert. denied*, 1970, 400 U.S. 956, 91 S.Ct. 353, 27 L.Ed.2d 264.

But counsels' responsible unwillingness to charge fraud or the trial court's failure to use such a conclusory term or its equivalent synonyms does not necessarily end the matter.

### Four Oaths—Fair Or Foul?

▆ Sherwood did assert "Four False Oaths" in connection with the Russo-Halligan application. First, Russo's oath he was the sole inventor, made when the application was originally filed. Second, Russo and Halligan's joint oath in a Verified Statement of Facts supporting conversion from a sole to a joint application, that the sole application resulted from Russo's erroneously informing the patent attorneys he was the sole inventor. (See note 6). Third, the joint oath, in a Supplemental Verified Statement of Facts that Halligan's contribution was first discovered March 15, 1968. Fourth, the joint oath that Russo and Halligan were co-inventors.

Obviously on our holding of non-inventorship by Russo, the First and Fourth Oaths turn out to be erroneous. To es-

---

**18.** There is no express mention of a valving function, but—at least in this context—a device claiming an ability to seal the needle inside from contamination should be deemed to claim, and therefore disclose, an ability to stop outward flow. That *is* a valve's function.

**19.** B-D's Krug conceived a spring-operated, single-needled device, (Def. Ex. 108) and Sherwood's Brown (Def. Ex. 8) conceived the M–214 before the 1967 material development. Neither device was either made public or actu-

ally known to Nehring. Whether, therefore, they constituted "prior art" as such, or not, they may properly be considered as circumstantial evidence supporting the conclusion Nehring's development was obvious to one skilled in the art.

**20.** The Court's purpose was to "[see] that patent monopolies spring from backgrounds free from fraud *or other inequitable conduct* . ." 324 U.S. at 816, 65 S.Ct. at 998, 89 L.Ed. at 1387 (emphasis added).

tablish that, however, is a long way from finding fraud or equivalent bad conduct by whatever milder name called. Indeed in patent prosecution this can be a fairly routine course of events—witness the efficient procedure for amending inventorship authorized by 35 U.S.C.A. § 116 and implemented by Rule 45 of the Patent Office. It was not until long after the issuance of the patents that it was finally determined that Halligan was the sole inventor and, therefore, the application could not have been properly amended by any procedure. And this came about only after the penetrating pretrial discovery so indigenous to patent cases at the hands of advocates having "the ant-like persistence of [patent] solicitors", Lyon v. Boh, S.D.N.Y., 1924, 1 F.2d 48, 50.

■ One who seeks an antitrust remedy for wrongful assertion of a void patent carries a heavy burden of proof, United States v. American Bell Telephone Co., 1897, 167 U.S. 224, 17 S.Ct. 809, 42 L.Ed. 144; Edward Valves, Inc. v. Cameron Iron Works, Inc., 5 Cir., 286 F.2d 933, *cert. denied*, 1961, 368 U.S. 833, 82 S.Ct. 55, 7 L.Ed.2d 34. *See*, Tresansky, Inventorship Determination, 56 J.Pat.Off.Soc. 551 (1974). *Compare* William R. Thropp & Sons Co. v. DeLaski & Thropp Circular Woven Tire Co., 3 Cir., 1915, 226 F. 941, *with* Agawam Co. v. Gordan, 1869, 7 Wall. 583, 74 U.S. 583, 19 L.Ed. 177. And even after the Trial Court's finding the last bell was not rung until our deliverance which, despite its awesome finality, came only after careful weighing of the appealing arguments pro and con before us.[21]

Sherwood has not carried that burden as to Oath First and Fourth.

The Second Oath[22] was the statement that Russo, [1] due to his lack of knowledge of patent laws, and with no intent to deceive, [2] "informed his attorneys prior to the patent application preparation that the invention was his sole invention . . ." and that [3] this was discovered for the first time in a developmental meeting.

With the full file wrapper available for public use on the issuance of the patent, pretrial discovery in the patent suit naturally led to Russo. On his deposition he stated in effect that he had not told the patent attorneys that he was the sole inventor. However, the record does reveal without substantial contradiction that Russo put together, wrote and submitted in his name the papers submitted to the patent attorney which precipitated the drafting of the initial patent application.

Here again, much as with Oath First and Fourth, considering the heavy burden[23] on avoidance for misconduct, there is a vast difference between that which is *false* and that which is incorrect—even positively incorrect or inaccurate. The verified statement was obviously prepared by experienced solicitors whose professional life depends on continued integrity in the eyes of the corps of patent examiners and those in the hierarchical review above them. There is nothing in this record which would have permitted the Trial Judge to conclude that this was a conscious misstatement by them for the patentees, or, more important, on the part of the then joint patentees or, equally important, on the part of responsible executives of B-D, who was shown to be the assignee.

Oath Third appears to present more difficulties but this disappears when considered with the absence of any showing of known, deliberate, conscious misstatement as in the case of Oath Second. This came about in view of the generalized statement (see Oath Second, part [3], above) that the joint inventorship was discovered for the first time at a

---

**21.** Indeed, this case may be far from over now, *see* F.R.A.P. 35 and 40; and 28 U.S.C.A. § 2101.

**22.** Submitted in a Verified Statement of Facts May 29, 1968.

**23.** United States v. American Bell Telephone Co., 1897, 167 U.S. 224, 17 S.Ct. 809, 42 L.Ed. 144; Edward Valves, Inc. v. Cameron Iron Works, Inc., 5 Cir., 286 F.2d 933, *cert. denied*, 1961, 368 U.S. 833, 82 S.Ct. 55, 7 L.Ed.2d 34.

developmental meeting. Under Rule 45(c) of the Patent Office, an application to include joint inventors must be made with diligence. Since no time was revealed in the initial supplemental statement, the Patent Office called for a specific showing.[24] In response to this the Second Supplemental Statement was filed on November 21, 1968 which specified that "it was discovered for the first time during developmental meetings on Friday March 15, 1968."

Well, as often the case as discovery reproves its necessity over the old time sporting system, this also turned out to be wrong. The deposition of Halligan revealed that in about August 1967 he learned that an application had been filed in Russo's name alone. In perhaps the understatement of the year Halligan's reaction was described as "totally annoyed". A B-D executive, Vice-President George Keller,[25] assured him that corrective action would be taken. Then followed the initial supplemental statement of May 29, 1968.

⬛ As with Oath Second, there is no indication by examination or probing into the minds of Russo or Halligan or any other responsible person in B-D that there was any conscious misrepresentation of a significant fact. Falsity for these purposes and under the prevailing burden[26] calls for more than inaccuracy, or, say in the cases of Russo and Halligan the subscribing affiants, imputed knowledge that in the exercise of prudence they ought to have known that what was stated was wrong.

We do not assay the merits of the diligence issue and recognize that in the race for priority stop watch precision may frequently be decisive not only on rights of others at home and abroad and in the administrative processing of patents within the impenetrable bowels of the patent office whose walls and personnel guard more secrets than, say, the vaunted CIA.[27]

But unlike *Beckman* in which we exact high standards of moral conduct in treating with the Patent Office, there is no showing that these factors led B-D or its responsible solicitors to a conscious effort to state March 1968 rather than, as subsequently learned, August. 1967 as the date against which diligence—not actual joint inventorship—was the only issue at stake.

The determination turns on these facts, not the characterization put. on them by Joseph Schimmel, ironically referred to as a "fraud expert" notwithstanding his eminent qualifications which we would be the last to disparage, but whose "expert testimony" takes us to the brink—yea even in a patent case which for added measure threw in the several times taken deposition of Examiner Majestic.

---

**24.** The Patent Office's letter was mailed September 6, 1966.

**25.** According to Halligan's testimony, Vice-President Keller was still with B-D at the time of the deposition. Keller's deposition was not taken, however.

**26.** United States v. American Bell Telephone Co., 1897, 167 U.S. 224, 17 S.Ct. 809, 42 L.Ed. 144; Edward Valves, Inc. v. Cameron Iron Works, Inc., 5 Cir., 286 F.2d 933, *cert. denied*, 1961, 368 U.S. 833, 82 S.Ct. 55, 7 L.Ed.2d 34.

**27.** Sherwood argues:

In the first place, a number of applications for patent had been filed in foreign countries on the Russo application. In those countries which require applications to be filed by the inventor, all of these applications would have to be dropped. More importantly, many foreign countries have the "absolute novelty" rule requiring that a patent application have an effective filing date earlier than any public use or knowledge. (In the United States, a one year period of grace is permitted.) Inasmuch as before May of 1968 the B-D needle had been utilized in the field and had been tested by a number of institutions, such public knowledge could have been an absolute bar to obtaining foreign patent protection.

Further, in interference proceedings, the party whose application is later in time (the "junior party") bears the burden of proving priority of invention. Creamer v. Kirkwood, 1962, 305 F.2d 486, 50 C.C.P.A. 715.

### Art Thou Citing Prior Art?

■ Our analysis of B-D's alleged failure to disclose the most pertinent prior art to the Patent Office is similar. This failure is asserted in connection with both Russo-Halligan and Nehring, and the failure to cite Adams[28] and some discarded material[29] in its glacial progress through the Patent Office.

Fair dealing, which is back of *Beckman,* is not a mechanical mandate that every patent ultimately cited by the Examiner in issuing the patent or, more so, by the unlimited industry or counsel in a years-later infringement suit in which every writing, periodical, or patent, foreign or domestic, is dredged up as prior art, must be cited in the application. It is again a matter of judgment in the light of accepted practices by and with the Patent Office in using good, not bad, faith in citing art thought to be of sufficient relevance.

The failure to cite these items of prior art does not rise to the level of unfair, bad faith dealing.[30]

What we hold puts an end to the antitrust claim against B-D.[31] With it goes the "extraordinary" factor so that the allowance of attorneys' fees is reversed.

As to the remainder of the case, however, we affirm the District Court's judgment that both patents in this suit are invalid because (i) Russo was improperly joined as an inventor in Patent No. 3,494,352, and (ii) Nehring's Patent No. 3,469,572 would have been obvious to one skilled in the art.

Affirmed in part; reversed in part.

---

**28.** Note 15, *supra.*

**29.** Sherwood contends other prior art devices also should have been cited. We analyze only the Adams contention, as it obviously is the critical one, see *Adam[s] Started It All,* p. 517, *supra.*

**30.** The charge that it was unfair dealing to fail to cite Russo-Halligan in Nehring filed at the same date and handled before the same Examiner (Majestic) by the same solicitor taxes credulity, even that of those unskilled in patentese. For Judges who handle literally over 700 judicial matters each year in this Court, it is inconceivable that the Examiner could have been unaware of a patent application in the same field sought by the same assignee and assisted by the same solicitor.

**31.** The case cited by both counsel in their post-conference memoranda, Kearney & Trecker Corp. v. Giddings & Lewis, Inc., 7 Cir., 1971, 452 F.2d 579, does not shake our conclusion that Sherwood cannot prevail on its antitrust claim.